UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FORTUNE PROPERTY MANAGEMENT, LLC, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § | Case No. 4:25-cv-4180 |
| WESTCHESTER SURPLUS LINES INSURANCE COMPANY, | § § § § | |
| *Defendant.* | § § | |

## <u>DEFENDANT'S MOTION FOR SANCTIONS</u>

Defendant, Westchester Surplus Lines Insurance Company ("Westchester"), files this Motion for Sanctions pursuant to Federal Rule of Civil Procedure 37 and the Court's Order regarding sanctions for discovery failures by Plaintiff (Dkt. No. 18), respectfully showing the Court as follows.

### *Executive Summary*

Westchester seeks to exclude from trial evidence concerning the water damage remediation performed by StopLoss Specialists, LLC ("StopLoss") and its subcontractors, and the costs associated with same, which Plaintiff is claiming as damages. Despite requests for deposition dates and then properly served deposition notices, StopLoss' project coordinator (Scott Butaud) and the StopLoss foreman (Eddie Krauzhoffman) both failed to appear for deposition. This failure to appear prejudices Westchester as the costs and scope of the

remediation work are hotly contested issues for trial. Further, Plaintiff has not paid StopLoss for any work, making StopLoss the *de facto* beneficiary of this lawsuit. If StopLoss witnesses cannot participate in discovery, the bills of StopLoss should not be recoverable.

Westchester seeks testimony from StopLoss concerning five critical issues:

1)  whether StopLoss performed its services in a good and workmanlike manner, as Plaintiff's expert, William Martin, testified in deposition that improperly handled mitigation by StopLoss actually increased the damages of Plaintiff, and Plaintiff's corporate representative testified in deposition that the property is still wet today;

2)  whether the scope of services performed by StopLoss were reasonable and necessary, as Westchester's expert, Timothy Lozos, will testify that StopLoss performed work which was both unnecessary and designed to drive up the cost of remediation;

3)  whether the remediation cost charged was reasonable, given that StopLoss charged $24,234.65 per day on average for 27 straight days, leading to a total bill of $654,335.60;

4)  whether StopLoss affirmatively misled Plaintiff into allowing the remediation work by misrepresenting to Plaintiff that Westchester would cover the work being done; and

5)  whether StopLoss violated Texas law concerning the unauthorized practice of public adjusting.

Absent testimony from StopLoss's critical witnesses, Westchester cannot adequately prepare for trial. Moreover, allowing testimony concerning the

work performed by StopLoss, when StopLoss has failed to appear, risks rewarding StopLoss and Plaintiff for their discovery non-compliance.

Westchester complained of Plaintiff's discovery failings earlier in Westchester's Unopposed Motion for Continuance (Dkt. No. 17). The Court denied the continuance but included this express warning to Plaintiff: Westchester "may bring a motion for sanctions for discovery failures by Plaintiff, if desired and believed warranted, including to strike claims or evidence." (Dkt. No. 18). The conduct of StopLoss and Plaintiff warrants sanctions. The Court should exclude from trial all evidence concerning the remediation costs and efforts performed by StopLoss and its subcontractors.

### *Pertinent Background*

**A. StopLoss' Involvement in the Claim.**

On October 29, 2024, Plaintiff reported a claim for "a pipe leak, causing water to leak onto the floor" at Plaintiff's property located at 12755 Southwest Freeway, Stafford, Texas (the "Property"), for damage which allegedly occurred the day before. Westchester promptly acknowledged the claim the same day.

On October 30, 2024, Plaintiff entered into a Work Agreement with StopLoss Specialists LLC ("StopLoss") for "professional services, project management, labor, equipment, and/or materials…to perform damage assessments, stabilization, mitigation, remediation, and/or repairs to the Property…" *See* **Exhibit 1, Work Agreement, Paragraph 1.** The Work

Agreement was signed by Scott Butaud ("Mr. Butaud"), the Project

Coordinator, on behalf of StopLoss. *Id.* **at Page 8.** The Work Agreement is

overreaching and one-sided in favor of StopLoss, gives StopLoss the authority

to make decisions about the claim and handle the claim, and specifies that all

insurance proceeds are to be paid to StopLoss:

> **CLIENT** hereby authorizes **StopLoss** to have direct contact and negotiate with **CLIENT's** Insurance Company of record, Insurance Company's Adjuster and/or Agent as it relates to this claim and further authorizes **StopLoss** to make decisions based on its expertise to prevent further damage to the above mentioned property.
>
> * * *
>
> **Direct Payment Authorization**: **CLIENT** hereby irrevocably agrees to expressly instruct and direct its Carrier or any other payor, public adjusting firm, ("the Public Adjuster"), attorney, or any agent representing **CLIENT** in the claim ('Claim') (the "Payor(s)") to make payments directly to the trust account ("Trust Account") of Florida Insurance Law Group who shall disburse the funds received for the **StopLoss** services rendered and or to be rendered in connection with the Claim to **StopLoss** and pursuant to the express contractual right of subrogation *(NOT ASSIGNMENT)* hereby granted by **CLIENT** to **StopLoss**. **CLIENT** also hereby instructs its Carrier to provide **StopLoss** all relevant information requested by **StopLoss**, its representative, or its Attorney, in connection with the Claim.

*Id.* **at Paragraphs 1, 4.d.** Notably, "Florida Insurance Law Group" is a

policyholder law firm out of Miami, like Plaintiff's counsel:

https://www.itl.legal/florida-insurance-law-group

As part of the Work Agreement, StopLoss performed mitigation and repair work at the Property from October 28, 2024 to November 24, 2024. *See* **Exhibit 2, Report of Findings, DeFacto Consulting Group, Inc., Page 10.** At that rate, StopLoss charged an average of $24,234.65 per day for 27 straight days to mitigate water from a pipe leak where the water allegedly barely left the edge of the kitchen. StopLoss's total bill to Plaintiff was $654,335.60.

During StopLoss' work, Plaintiff's corporate representative, Mr. Shuai Wang ("Mr. Wang"), spoke with StopLoss' project foreman, Mr. Eddie Krauzhoffman, about the pipe leak. Mr. Krauzhoffman—who had a financial interest in making the claim as big as possible—assured Mr. Wang that Westchester would cover everything, even though Plaintiff and/or its counsel prevented Westchester from inspecting the loss until January 27, 2025 which was well after StopLoss' mitigation work was completed. Mr. Wang testified:

> Q. Did you provide any instructions or limits on what StopLoss was supposed to do?
>
> A. Yes. I basically told them that only repair the area that insurance is willing to cover. If it is not covered, don't do it.
>
> Q. And what did StopLoss say in reply?
>
> A. They said, "Okay."

* * *

Q. Do you know whether StopLoss followed your instructions or not?

A. I am not aware of whether they -- they did that or not. But I was told at all time that the areas and the work they have done would be covered by the insurance.

Q. So StopLoss made those statements to you? That its work would be covered?

A. Correct.

* * *

Q. All right. Thank you, Mr. Wang. You provided us with the name and contact info for an Eddie Krauzhoffmann, K-R-A-U-Z-H-O-F-F-M- A-N-N, cell number REDACTED. And his position was restoration foreman; is that correct?

A. (In English) Yes.

(Interpreter) That's correct.

Q. So Mr. Eddie, we'll call him, is the person you dealt with when you were dealing with StopLoss?

A. Correct.

* * *

Q. Did StopLoss or Restore Zone make any statements to you or promises to you about the work that they would be doing?

A. So basically, what I heard were all oral or verbal commitment and promises saying that there is no problem; all these are covered by the insurance.

* * *

Q. Did you or Mr. Jia Zhao Wang negotiate any terms of the service agreements with Restore Zone or StopLoss?

A. Yes. We did have some negotiations.

Q. What was the result of the negotiations?

A. So that was that they said all these items will be worked on? It will be covered by the insurance, and all will be covered. Therefore, we just give them the approval to go ahead and help us out.

*See* **Exhibit 3, Deposition Transcript of Shuai Wang, Pg. 43, Lines 16-22; Page 45, Line 21 to Page 46, Line 4; Page 48, Lines 15 to 24; Page 63, Lines 1 to 6.; Page 65, Lines 11 to 20.**

Mr. Wang testified that he did not understand what StopLoss was doing and that he felt StopLoss' charges were extremely high:

Q. So is it fair to say as you went along, you did not know what was being billed or what work was being done?

A. That's correct. I don't know nothing at all.

Q. At some point, though, you got a look at bills and invoices from the contractors doing work?

A. That's correct.

Q. Do you recall the amounts of those bills?

A. Well, yes. By reviewing the bills later, I feel that the amount was extremely high.

Q. Why did you feel that the amounts were extremely high?

A. That is because that -- by the experience that I have subcontracting the workers to do some remodeling and work for the restaurants. This particular bills that I have seen is much higher than those works that I have worked on myself before.

*Id.* **at Page 66, Lines 1 to 18.**

Since Plaintiff filed suit in the middle of the claim, Westchester conducted audits of StopLoss' claimed mitigation costs twice. Westchester's consultant, Timothy Lozos, Certified Professional Estimator and Principal Consultant of DeFacto Consulting Group, Inc., concluded that StopLoss' mitigation invoices represented a severe deviation from standard industry practices. StopLoss introduced unnecessary complexities into the project, such as elaborate containment strategies, phased demolition, and extensive night-shift operations. **Ex. 2. at Pages 12-13.** Specifically, Mr. Lozos opined:

> By any standard metric of construction management or cost estimating, a reasonable and prudent owner of a restaurant would not independently elect to go through this highly disruptive, month-long process to rack up a $650,000 mitigation bill for a localized leak that caused less than $45,000 in repairable, non-structural damages. The methodology employed here points to a strategy of maximizing billable hours and equipment charges rather than performing a targeted, necessary mitigation of the loss.

*Id.* **at Page 14.**

Further, Plaintiff listed Mr. Butaud as its first expert who will testify regarding a wide range of topics:

- The cause and source of the water intrusion and the relationship between the pipe release and the conditions observed at the property.

- The scope and coordination of emergency mitigation services performed at the subject property;

- The deployment and utilization of specialized drying equipment, including dehumidifiers, air scrubbers, generators, and related remediation tools;

- Labor requirements, supervisory oversight, and safety protocols implemented during the remediation process;

- The necessity and reasonableness of the mitigation measures undertaken to prevent further damage and stabilize the property;

- Industry standards governing large-loss mitigation, drying practices, and environmental controls;

- The reasonableness of the charges reflected in StopLoss invoices and project documentation.

**Exhibit 4, Plaintiff's Expert Designation, Page 1.**

Simply put, StopLoss – and more specifically Mr. Butaud and Mr. Krauzhoffman – are crucial to Plaintiff making out its liability and damages case. They are not low-level employees or subcontractors; instead, they are the project coordinator and remediation foreman for the work performed. StopLoss' involvement is so great that Plaintiff has essentially been sidelined in its own case. In deposition, Plaintiff's corporate representative knew almost nothing about the claim itself, had not seen any coverage correspondence, had no complaints about Westchester or its business practices until led to give such testimony by Plaintiff's counsel, had no complaints about the conduct or methods of Westchester's engineer and independent adjuster, and conceded that Westchester did nothing evil or intended to harm Plaintiff. ***See* Exhibit**

**5, Plaintiff's Corporate Representative Deposition, Mr. Jiazhao Wang, Page 83, Line 22 to Page 84, Line 19; Page 101, Lines 2 to 5.**

**To put it mildly, Plaintiff may have filed suit, but this claim was managed and expanded by StopLoss for the benefit of StopLoss.**

**B.      Plaintiff's Failure to Present StopLoss Witnesses.**

On March 27, 2026, the undersigned counsel emailed Plaintiff's counsel, stating that he wanted to depose both Mr. Krauzhoffman and Mr. Butaud of StopLoss, and that he was available on April 7, 9, and 20, 2026 for those depositions. *See* **Exhibit 6, March 27, 2026 Email Communication**. The agreed discovery cutoff was May 7, 2026.  Plaintiff's counsel did not respond. On March 30, 2026, undersigned counsel followed up with Plaintiff's counsel, again inquiring as to the availability for Mr. Krauzhoffman and Mr. Butaud. *See* **Exhibit 7, March 30, 2026 Email Communication**. Plaintiff's counsel failed and refused to provide deposition dates. On April 15, 2026, Westchester unilaterally noticed the depositions for April 29 and 30, 2026, respectively. *See* **Exhibit 8, Email enclosing Notice of Intention to Take Oral and Videotape Deposition of Eddie Krauzhoffman and Notice of Intention to Take Oral and Videotape Deposition of Eddie Krauzhoffman**. Westchester sent reminders of the depositions on April 17 and 28, 2026, including links to the depositions.  Significantly, Westchester stated: "[The depositions of Mr. Butaud and Mr. Krauzhoffman] are still scheduled to take

10

place over the next two days and we will proceed with the depositions unless you provide satisfactory alternative dates immediately." **Exhibit 9, Emails.** There was no response.

Both Mr. Krauzhoffman and Mr. Butaud failed to appear for their depositions. *See* **Exhibit 10, Certificate of Non-Appearance concerning Mr. Krauzhoffman; Exhibit 11, Declaration concerning non-appearance of Mr. Butaud.**

**Argument**

Federal Rule of Civil Procedure 37 authorizes courts to impose sanctions for failure to cooperate in discovery. Specifically, Rule 37 provides:

(b)     FAILURE TO COMPLY WITH A COURT ORDER.

(1)     *Sanctions Sought in the District Where the Deposition Is Taken*. If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending.

(2) *Sanctions Sought in the District Where the Action Is Pending.*

(A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

In this case, the Court previously ordered that Plaintiff's discovery failures would be subject to punishment by sanctions. (Dkt. No. 18). Plaintiff's failure to heed and comply with that order subjects Plaintiff to sanctions under Rule 37.

In *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 378 (5th Cir. 1996), the plaintiffs' expert witnesses failed to appear for their depositions. The plaintiffs filed a belated motion in the trial court and sought a protective order, asserting that their experts had not formulated their opinions and should not be deposed. The trial court ordered that the depositions were to proceed, yet the plaintiffs' experts still failed to appear for their depositions. *Id.* As a result of their noncompliance, the trial court issued an order striking the testimony of the experts pursuant to Rule 37. *Id.* at 380. The trial court subsequently granted the defendants' motion for summary judgment and the plaintiffs' appealed. *Id.* At 377.

On appeal, the Fifth Circuit held that this trial court acted within its discretion in sanctioning the plaintiffs by excluding their expert witnesses'

testimony. *Id.* at 380. In so holding, the Court examined four factors: "(1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the witnesses' testimony." *Id.*

As to the first factor, the Court held that the plaintiffs' experts' had no plausible explanation for noncompliance to complete their work within the deadline set by the trial court. *Id.* at 381. As to the second factor, the Court held that the defendants would have been materially prejudiced if the plaintiffs were permitted to perpetually delay the deposition of the experts, and that "***the delay in producing and deposing expert witnesses resulted in additional expense and disrupted the defendants' preparation of the case***." *Id.* (Emphasis added).

As to the third factor, the Court reasoned that while the plaintiffs never requested a continuance from the trial court, it would not have mattered as it would have only resulted in additional delay and unnecessarily increased the expense of defending the lawsuit. *Id.* Finally, as to the fourth factor, the importance of the excluded testimony, the plaintiffs argued that the expert testimony should not have been excluded because of its importance to their case, and the exclusion of this testimony was tantamount to a dismissal of their claims. *Id.* The Court emphasized that while the plaintiffs were correct, that

the exclusion of the experts damaged their case, the trial court did not abuse its discretion in striking the testimony as the plaintiffs "***repeated dilatory behavior even in the face of explicit warnings*** and the apparent inability of the experts to produce relevant opinions within the specified time frame ***renders hollow any claims of unfair prejudice***." *Id.* (Emphasis added).

The facts here are similar to those in *Barrett*. Like the plaintiffs in *Barrett,* Plaintiff has failed has repeatedly engaged in delayed cooperation and non-cooperation in discovery, and failed to adhere to and heed this Court's order, in which it advised Westchester that it "may bring a motion for sanctions for discovery failures by Plaintiff, if desired and believed warranted, including to strike claims or evidence." (Dkt. No. 18). Despite this order, Plaintiff still failed to present both Mr. Krauzhoffman and Mr. Butaud for their depositions. Even further, Mr. Butaud has been designated as Plaintiff's first expert in this matter. Westchester is deprived of deposing Plaintiff's first expert listed in Plaintiff's expert designation. This Court should follow *Barrett* and impose sanctions on Plaintiff under Rule 37(b)(2)(A)(ii), by: (1) precluding any testimony by or on behalf of StopLoss, including Mr. Butaud and Mr. Krauzhoffman at trial; 2) precluding Plaintiff from putting on any evidence concerning StopLoss or its invoices, records, or amounts charged for StopLoss' work, or that of StopLoss' subcontractors; and 3) precluding Plaintiff from putting on evidence of the alleged $654,335.60 in StopLoss' mitigation work

including the work of any subcontractors. *See also Certain Underwriters at Lloyds London v. Corporate Pines Realty Corp.*, 335 Fed. Appx. 778, 780 (5th Cir. 2009) (holding that the trial court did not abuse its discretion to exclude evidence under Rule 37 where there was misconduct in connection with a deposition that deprived the defendant of examining facts in documents).

Further, courts possess the inherent power "to protect the efficient and orderly administration of justice and . . . to command respect for the court's orders, judgments, procedures, and authority." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993). Included in this inherent power is "the power to levy sanctions in response to abusive litigation practices." *Id*. "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions" *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292-93 (5th Cir. 1997) (citations omitted).

Finally, courts possess "broad discretion" in how they "preserve the integrity and purpose of the pretrial order." *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990).

In this case, the Court made it clear that it is preserving its pretrial order without a continuance, enforceable by sanctions against Plaintiff if necessary. Nevertheless, Plaintiff failed to present two key witnesses, including an expert. The prejudice to Westchester is obvious. At a minimum, Westchester is

entitled to "vigorous cross examination" of purported expert testimony. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)). But Westchester has been deprived of even that in this case, despite a warning from the Court.

### *Prayer*

Defendant, Westchester Surplus Lines Insurance Company, respectfully asks that this Motion for Sanctions be granted; that this Court: 1) preclude any testimony by or on behalf of StopLoss, including Scott Butaud and Eddie Krauzhoffman, at trial; 2) preclude Plaintiff from putting on any evidence concerning StopLoss Specialists, LLC or its invoices, records, or amounts charged for StopLoss' work, or that of its subcontractors; 3) preclude Plaintiff from putting on evidence of the alleged $654,335.60 in StopLoss' mitigation work including the work of any subcontractors; and 4) grant Defendant any such other and further relief to which it may be justly entitled.

Respectfully submitted,

*/s/ Karl A. Schulz*

Karl A. Schulz
State Bar No. 24057339
COZEN O'CONNOR
811 Main, Suite 2000
Houston, Texas 77002
Telephone: (832) 214-3900
Facsimile:  (832) 214-3905
kschulz@cozen.com

ATTORNEYS FOR DEFENDANT,
WESTCHESTER SURPLUS LINES
INSURANCE COMPANY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 14, 2026, a true and correct copy of the foregoing document was served upon the following via the Court's electronic filing system and/or by e-service:

Anthony Pastor
National Insurance Advocates, LLP
5900 Balcones Drive, Suite 100
Austin, Texas 78731
service@nia.law
anthony@nia.law
***Attorney for Plaintiff***

*/s/ Karl A. Schulz*

Karl A. Schulz