

Ex. 2



# Report of Findings

**DFCG File #:**

1262

**Structure Identification:**

Fortune Property Management, LLC.

12755 Southwest Freeway

Stafford, TX 77477

**Claim #:**

KY24K3100086

**Prepared For:**

Mr. Karl Schulz

Cozen O'Connor

811 Main Street, Suite 2000

Houston, TX 77002







**APPRAISALS**    **BUILDING CONSULTING**    **COST ESTIMATING**    **DISPUTE RESOLUTION**    **EXPERT WITNESS**



March 27, 2026

Mr. Karl Schulz
Cozen O'Connor
811 Main Street, Suite 2000
Houston, TX 77002

| **File:** | Fortune Property Management, LLC | **DFCG File #:** | 1262 |
| **Address:** | 12755 Southwest Freeway | **Claim #:** | KY24K3100086 |
| | Stafford, TX 77477 | **Date of Loss:** | 10/28/2024 |

Dear Mr. Schulz,

DeFacto Consulting Group, Inc. is pleased to submit this report for the above-named file. By signature below, this report was authored by and prepared under the direct supervision of the undersigned professional. Please contact us if you have any questions regarding this report.

Regards,

Timothy J. Lozos, CPE

Principal Consultant

DeFacto Consulting Group, Inc.



DFCG: Report1-1262.doc

**DEFACTO CONSULTING GROUP, INC.**

DALLAS/FORT WORTH    ☎ 800·674·DFCG   ⊕ WWW.DFCG.NET    SAN ANTONIO
HOUSTON    210 N. ECTOR DRIVE, #310 EULESS, TX 76039    OKLAHOMA CITY

## GENERAL INFORMATION

| | |
|---|---|
| File Name: | Fortune Property Management, LLC |
| Structure Address: | 12755 Southwest Freeway |
| | Stafford, TX 77477 |
| Date of Site Visit: | 3/12/2026 |
| DFCG Personnel Present: | Timothy J. Lozos, CPE |
| | Rogan J. Cudworth, BA, AEP |

## AUTHORIZATION

DeFacto Consulting Group, Inc. (DFCG) was authorized by Mr. Karl Schulz of Cozen O'Connor (client) to opine on the costs associated with water damages related to a broken pipe to the property located at 12755 Southwest Freeway in Stafford, Texas (subject structure) which occurred on or about 10/28/2024.  DFCG was further authorized to review and opine on provided documents, cost estimates, and data collected by others.

## SCOPE OF INVESTIGATION

DFCG's scope of investigation consisted of a site visit, a review of received information, a review of photographs and site information provided by others, research, and analysis.

DFCG conducted a visual evaluation of the subject structure's roof, exterior, and interior.  DFCG photographically documented the existing conditions observed at the subject structure.  Drone photography was used for additional documentation of the roof of the subject structure.  3-D camera scanning was used for additional documentation of the interior of the subject structure. Destructive testing was not performed by DFCG.

## DISCLAMER

This report is provided solely in DFCG's capacity as a building consultant and is not to be construed as a "real estate inspection" as defined or regulated under Texas law or the rules of the Texas Real Estate Commission.

This report does not constitute professional engineering services or opinions. This report is not intended for regulatory approval, permitting, or construction.  It was prepared for the purpose identified herein and exclusively for the Client.

Reliance upon this report by other parties is expressly prohibited.  See the **Limitations** section of this report for additional information.

# DESCRIPTION OF STRUCTURE

The subject structure was a single-story, commercial restaurant built in 2001[1].  For reference, a photograph of the subject structure has been provided below (**Figure 1**).  Design and construction documentation was not available for review at the time of this writing.



**Figure 1: Front Elevation (DFCG 3/12/2026)**

# RECEIVED INFORMATION

In addition to on-site observations, the opinions presented in this report may be based on the following information received by our office.  The documents below are listed by date where applicable.  Cost estimate amounts should be considered replacement cost values (RCV) without adjustment for depreciation or deductible unless otherwise stated.

- *Stephens Engineering Consultants, Inc., Report of Findings (10/3/2024)*

- *Engle Martin, Statement of Loss (10/28/2024)*

- *FIH, LLC, Water Damage Assessment (11/01/2024)*

- *StopLoss Specialists, LLC, Various Invoices (various dates)*

- *StopLoss Specialists, LLC, Executive Summaries (various dates)*

- *Engle Martin, Report One (12/05/2024)*

- *Chubb, Reservation of Rights Letter (01/15/2025)*

---

[1] *Fort Bend Central Appraisal District, "Property Details for 12755 SW Freeway (Quick Reference ID:R164424), FBCAD Property Search, accessed March 2026, https://esearch.fbcad.org/Property/View/R164424?year=2025&ownerId=O0906485*

- *Engle Martin, Cost Estimate – $44,423.13 (02/17/2025)*

- *Engle Martin, Report Two (02/20/2025)*

- *ProNet Group, Inc., Report of Findings (02/25/2025)*

- *National Insurance Advocates, Formal Notice Letter (03/13/2025)*

- *Engle Martin, Report Three (03/19/2025)*

- *Frontline Property Damage Consultants, Cost Estimate – $173,668.67 (05/23/2025)*

- *Various Subcontractor invoices (various dates)*

- *Various Photographs by others*

- *Specialty Audit Services, Mitigation Audit (undated)*

## SITE OBSERVATIONS

For discussion purposes, the front of the subject structure was assumed to face **northwest**. Select photographs included within the body or **Appendix** of this report are presented for information only or for a general representation of the condition of the structure and surrounding property.  Additional photographs have been maintained by our office.   A link to the 3-D camera scan performed by DFCG has been included in the **Appendix** of this report.

**Exterior:** The exterior cladding of the subject structure consisted primarily of painted stucco. Staining and discoloration was observed to the exterior stucco in multiple locations.   An approximately 3' foot horizontal crack to the stucco veneer with what appeared to be three sheets of fiber reinforced polymer (FRB) wall paneling was observed on the southwest elevation adjacent to a man door.

In several areas the base perimeter paint applied to the stucco was peeling.  Several glazing panels were cracked along the northeast elevation.  DFCG also notes a large amount of construction debris and materials on the property such as roll off dumpsters, tractor trailers, busted up piles of cement, shipping pallets, discarded drywall, and other architectural interior materials at the time of site visit.

**Roof:**  DFCG employed drone imagery to perform a review of the roof surfacing and appurtenances.  In general, the roof appeared to be of newer installation.  The roof consisted of three primary roof coverings: concrete roofing tiles, modified bitumen, and single-ply membrane.  The modified bitumen section covered the primary interior space.  The concrete roofing tiles covered the front unloading area and decorative facades.  A single-ply membrane

was covering a section in the back southwest corner of the roof and draped over a large RTU casing in the center portion of the roof.  Evidence of long-term moisture pooling was observed to the modified bitumen roofing.

<u>Interior:</u> The interior was in a state of extensive remodeling.  The majority of architectural finishes in the front of house dining areas, such as ceiling tiles, drywall, wall panels, and floor coverings, had been removed.   Items related to restaurant seating such as tables, chairs, and booths had also been removed.  Sections of the commercial steel framing were exposed in areas of both the front of house and back of house areas.

The concrete slab had been saw cut and excavated throughout the structure in multiple trenches with what appeared to be newly installed PVC plumbing.  Saw cuts to slab began at the northeast exterior wall running southwest into the kitchen hallway that connects the washing stations to the cooking area.  An additional saw cut approximately 2'x4' was located at the northeast section of the main cooking area.

The back of house cooking areas appeared to be in more original condition.  The 4"x4" floor tiles were still intact with exception to areas directly adjacent to saw cuts.  The in-place tiles were covered in layers of grease, earth, and gypsum to the point of obscuring their red color.

Drywall, stainless steel wall panels, and FRP wall panels were generally still in place though dirty and stained.  Acoustic ceiling tiles were also generally still in place with approximately a dozen missing or loose.  Staining and discoloration was observed throughout the remaining ceiling tiles.  Additionally, a good portion of the commercial cooking equipment was disconnected and randomly placed throughout the back of house cooking areas.

Loose construction materials and debris were strewn throughout the interior of the subject structure such as piles of earth, wheelbarrows, tools, cuts of drywall, PVC piping, and plumbing fixtures.

# REVIEW OF RECEIVED INFORMATION

DFCG's reviewed the proposed costs and scope of repair in cost estimates and other received documents as provided.  A summary of the reviewed documents is presented below.  This summary is meant as an overview of the documents provided and is not intended as a recapitulation of the entire documents' contents.  Not all documents have been commented upon, however this should not be taken as agreement with those documents.  DFCG's review and commentary are listed below.

## Report of Findings by Stephens Engineering Consultants, Inc.

DFCG reviewed the report of findings by Stephens Engineering Consultants, Inc. (Stephens), dated 10/3/2024.  Stephens was tasked to investigate the cause of reported moisture of the insured property.  Specifically, the inspection aimed to determine whether the purported damage was the result of wind or hail associated with Hurricane Beryl on or about 7/8/2024. Stephens concluded (in part) the following:

- **No Wind Damage to Roofing:** The inspection revealed no evidence of wind-related damage (such as torn, folded, or missing materials) to any of the subject structure's roofing systems, which included modified bitumen, stone-coated metal shingles, metal panels, thermoplastic membrane, and polycarbonate panels.

- **No Functional Hail Damage:** While cosmetic indentations from historical hailfall were observed on HVAC condenser fins, there was no functional hail damage to the roofing systems.

- **Cause of Moisture Intrusions:** The moisture damage observed inside the structure was not the result of storm-created openings in the roof.  The intrusions were caused by hidden deficiencies in the roofing and flashing at various roof penetrations (e.g., HVAC curbs).

- **Condensation Issues:** Rusted T-Bar ceilings and ceiling vents observed in the main eating area were attributed to historical and ongoing condensation.

- **Historical and Maintenance Issues:** Other observed conditions on the property were attributed to historical drainage deficiencies, expected aging, mechanical damage, and standard wear.

**DFCG's Commentary:** DFCG notes that Stephens' inspection of the subject structure took place on 9/13/2024, approximately 6 weeks prior to the reported pipe leak.

## Various Reports by Engle Martin

DFCG reviewed the reports by Engle Martin dated 12/5/2024, 2/20/2025, and 3/19/2025. Engle Martin's investigation into the claim evolved over the course of three reports, shifting from an initially reported sewer backup leak to a corroded plumbing line, while uncovering severe discrepancies involving preexisting Hurricane Beryl damages.

## Report One

- **Original Cause of Loss:** The initial claim reported that the insured sustained damage to an underground pipeline.  However, at the time of the first report, it was undetermined whether the damage was the result of a sewer back-up or a ruptured pipeline **(Figure 2).**
- **Initial Contact and Inspection:** Engle Martin received the assignment on 11/4/2024, but their repeated attempts to contact the insured's public adjuster to schedule an inspection went unanswered.
- **Site Condition:** Engle Martin performed a "cold call" site inspection on 11/20/2024 and found that a grassy area in front of the building had already been excavated.

> **Water –** It was reported that the insured sustained damage to their underground pipeline.  However, it is undetermined whether there was a sewer back up or ruptured to the pipeline.

Figure 2: Engle Martin (12/05/2024)

## Report Two

- **Revised Cause of Loss:** The cause of loss was updated from an undetermined sewer issue to a ruptured pipe located above the drop ceiling in the kitchen area.
- **Delayed Inspection:** Engle Martin was finally able to conduct a formal site inspection with the mitigation contractor on 1/27/2025, three months after the reported date of loss. By this time, all water mitigation had already been completed, and the ruptured pipe had been abandoned rather than repaired.
- **Discrepancies and Hurricane Beryl:** During the walkthrough, the mitigation contractor explicitly directed the adjuster's attention to damaged areas in the building that were caused by Hurricane Beryl rather than the plumbing leak **(Figure 3).**
- **Excessive Mitigation:** The adjuster prepared a repair estimate of $44,423.13 for the plumbing damages but noted that the $654,758.66 in mitigation invoices submitted by StopLoss seemed highly excessive for the localized event, prompting a recommendation for a formal audit.

> We observed removed insulation from the attic, water damaged ceiling tiles, and removed glued down carpet from the dining areas of the restaurant. In addition to the water damages due to the ruptured pipe, Mr. Schueller  directed our attention to damaged areas in the building caused by Hurricane Beryl. We were also informed that the restaurant is in the process of beginning a total interior remodel of the building. The restaurant was in operation and open for business at the time of our site inspection. Mr. Schueller explained they completed mitigation repairs at night in one section at a time so the business could remain in operation during the day and evening.

Figure 3: Engle Martin (2/20/2025)

### Report Three

- **Engineering Findings:** ProNet Group determined that the leak in the kitchen water supply line was consistent with a sudden opening combined with long-term deterioration, seepage, and corrosion.
- **Legal Demand Discrepancies:** Engle Martin received a formal notice of intent to sue from the insured's attorney.  While the letter referenced the 10/28/2024 date of loss and the claim number for the pipe leak, the actual contents of the letter demanded payment for extensive roof damage, ceiling stains, and severe interior leaks caused by Hurricane Beryl on 7/8/2024.

**DFCG's Commentary:** A review of the three Engle Martin reports and associated correspondence reveals discrepancies regarding the cause of loss, the timeline of events, and the resulting scope of repairs.  The documented evidence presents substantial challenges in segregating the damages attributable to the 10/28/2024 plumbing event from preexisting damages and other causes.

**Detrimental Delay and Unverified Scope of Repairs**: A primary factor complicating the accurate determination of the claim's scope is the unnecessary delay in the initial site inspection.  Engle Martin received the assignment on 11/4/2024, but due to a lack of response from the insured's public adjuster, an interior inspection was delayed until 1/27/2025.

By the time interior access was granted, all water mitigation had been completed, and the ruptured pipe had been abandoned.  This three-month delay is highly detrimental to accurately determining the scope of repairs.  Specifically, it prevented Engle Martin from observing the contemporaneous conditions of the loss, making it exceptionally difficult to verify the true extent of moisture distress that was actually related to the localized ceiling leak versus preexisting conditions.

**Discrepancies in Causation:** The initial claim was reported as damage to an underground pipeline, the result of a sewer back-up or a ruptured pipeline.  During Engle Martin's "cold call" site visit on 11/20/2024, the adjuster documented and photographed an excavated and backfilled area in the grass outside the building.   It was not until after Engle Martin's interior inspection of 1/27/2025 that the cause of loss was updated to reflect the ceiling plumbing leak, at which point the investigation and documentation of the distressed conditions caused by the reported leak was severely hampered due to mitigation being completed.

In DFCG's opinion, this raises questions regarding the scope of repairs, especially the extent of flooring distress related to the ceiling supply line leak.  If the subject structure's sewer lines were not functioning correctly, they may have been a point of causation for the suspected fungal growth shown in photographs in areas that were not adjacent to the water loss.

## Cost Estimate by Frontline Property Damage Consultants

DFCG reviewed the cost estimate totaling $173,668.67 by Frontline Property Damage Consultants (Frontline) dated 5/23/2025.  The cost estimate was produced with the estimating software Xactimate® by Xactware Solutions, Inc. using the published regional construction cost database *TXHO8X_MAY25.*

The general scope of repairs in Frontline's estimate included removing and replacing suspended ceiling tiles and ceiling grid throughout, replacing ceiling lights, removing and replacing wall logo graphics, replacing glue-down carpet, baseboards, contents manipulation, and cleaning. Frontline further included General Contractor's overhead and profit of 10% and 10% (respectively) applied to the subtotal of the repair items.  Applicable commercial state and local sales tax of 8.25% was applied to the total of all items.

DFCG's analysis of the cost estimate prepared by Frontline noted significant anomalies, particularly regarding its timeline and its failure to segregate distinct causes of loss, and other deficiencies and errors of estimating methodology which do not conform to generally accepted professional estimating practices.   The following examples are given to highlight these deficiencies but do not represent an exhaustive or complete list of deficiencies found by DFCG. Examples of the deficiencies noted include the following:

<u>Timeline Discrepancies:</u> The Frontline estimate lists a "Date Inspected" of 5/21/2025.  This inspection date occurs significantly after the relevant events in this claim, specifically:

- Nearly seven months after the claimed 10/28/2024, plumbing leak.

- More than ten months after Hurricane Beryl affected the property on 7/8/2024.

- Approximately four months after Engel Martin had completed their delayed site inspection on 1/27/2025.

<u>Failure to Segregate Causes of Loss</u>: Given the extended timeframe between the reported events and the Frontline inspection, the resulting estimate does not appear to differentiate between recent water damage, historical conditions, or ongoing maintenance issues.

The estimate notes that "*The origin of loss appears to be the result of a busted pipe above the dish washing area in the kitchen"* and states it reflects the necessary repairs to return the restaurant to the condition it was in *"prior to the pipe bust"*.   However, Frontline's scope of work encompasses widespread replacements across the building, including the Main Dining room, Banquet Room, Event Room, Formal Room, and all kitchen areas.

Frontline does not provide an analysis or methodology to separate the damages attributable to the localized pipe leak from other documented conditions, such as:

- The interior leaks and water intrusions, which were acknowledged in the insured's prior communications regarding Hurricane Beryl.

- The rusted ceiling grids, ongoing roof ponding, and preexisting stained carpets documented by Stephens Engineering in September 2024.

By inspecting the property in May 2025 and attributing the observed interior moisture distress uniformly to the October 2024 pipe leak, the Frontline estimate combines multiple distinct property conditions, including preexisting damage, historical roof defects, and the plumbing leak incident into a single, undifferentiated scope of repair.

**Excessive Scope of Repair:** The extent of Frontline's scope of repair exceeds the apparent extent of the areas damaged by the plumbing leak.  There is no basis for replacing the entire ceiling tile and grid system.  Similarly, there is no basis for replacing the business logo graphics as there is no evidence these were damaged by water or even in the vicinity of the leak.  Additionally, portions of Frontline's estimate, such as the ceiling grid and tiles, call for removal and replacement, whereas after mitigation efforts were complete, replacement of the damaged items would be correct.  This error by Frontline duplicates costs for work that has already been performed.

DFCG is of the opinion that including betterments without basis does not conform to generally accepted professional estimating practices and does not correctly reflect the reasonable and necessary costs to repair the alleged defects in question.

**Excessive Unit Costs:** Frontline's cost estimate includes unit costs that are not competitive with published construction cost reference data and do not accurately represent what a typical qualified contractor would charge in a legitimate proposal for a similar scope of repair.

Frontline's estimate uses an incorrect price list *TXHO8X_MAY25* (May 2025, Houston, TX), where the zip code and claimed date of loss indicates that *TXHO8X_OCT24* (October 2024, Houston, TX) would be correct.

DFCG is of the opinion that inflating unit costs beyond what would be considered economically viable or competitive within the local geographic area does not correctly reflect the reasonable and necessary costs to repair the damages in question.

## Mitigation Executive Summaries by StopLoss Specialists, LLC

DFCG reviewed the executive summaries of the mitigation work by StopLoss Specialists, LLC (StopLoss).  A breakdown of the working days, personnel assignments, and details regarding dimensions or quantities of the materials removed follow below.

## Working vs. Not Working Days

Out of the 27 daily reports provided between 10/28/2024 and 11/24/2024 (11/17/2024 is missing from the record), StopLoss crews were actively performing mitigation or demobilization work on 19 days and not actively working on 8 days.

- **Active Working Days (19 Days)**
  - 10/28/2024: Initial leak response and water shutoff.
  - 10/29/2024: Removal of ceiling tiles/insulation, water extraction.
  - 10/30/2024: Cleaning and preparation for the restaurant's reopening.
  - 10/31/2024–11/01/2024: Containment, carpet removal, and manual adhesive removal.
  - 11/03/2024: Containment installation and equipment mobilization.
  - 11/04/2024–11/08/2024: Floor adhesive/carpet removal, containment, and Ramboard installation.
  - 11/10/2024–11/14/2024: Continued carpet/adhesive removal, Ramboard installation, and decontamination.
  - 11/22/2024–11/24/2024: Demobilization, equipment decontamination, and final detailed cleaning.

- **Not Working Days / Standby Days (8 Days)**
  - 11/02/2024: No operations performed (Security only).
  - 11/09/2024: No operations performed.
  - 11/15/2024: No operations performed (Crews off).
  - 11/16/2024: No operations performed (Crews off).
  - 11/18/2024: No mitigation operations performed (Air scrubbers removed, security only).
  - 11/19/2024: No operations performed (Security only).
  - 11/20/2024: No operations performed (Skeleton crew onsite only to maintain equipment).
  - 11/21/2024: No operations performed (Equipment deactivated).

## Personnel Assigned per Day

Below is the daily breakdown of personnel assigned to the job (calculated as the sum of Day Shift + Night Shift + Offsite workers).

- 10/28/2024: 2 personnel (2 Day)
- 10/29/2024: 10 personnel (10 Night)
- 10/30/2024: 13 personnel (10 Day, 2 Night, 1 Offsite)
- 10/31/2024: 18 personnel (1 Day, 17 Night)
- 11/01/2024: 21 personnel (20 Night, 1 Offsite)
- 11/02/2024: 2 personnel (2 Day) *(Not Working/Standby)*
- 11/03/2024: 6 personnel (2 Day, 4 Night)
- 11/04/2024: 21 personnel (21 Night)

- o   11/05/2024: 22 personnel (22 Night)
- o   11/06/2024: 18 personnel (18 Night)
- o   11/07/2024: 25 personnel (24 Night, 1 Offsite)
- o   11/08/2024: 23 personnel (22 Night, 1 Offsite)
- o   11/09/2024: 1 personnel (1 Night) *(Not Working/Standby)*
- o   11/10/2024: 21 personnel (21 Night)
- o   11/11/2024: 22 personnel (21 Night, 1 Offsite)
- o   11/12/2024: 21 personnel (19 Night, 2 Offsite)
- o   11/13/2024: 21 personnel (20 Night, 1 Offsite)
- o   11/14/2024: 19 personnel (18 Night, 1 Offsite)
- o   11/15/2024: 0 personnel *(Not Working)*
- o   11/16/2024: 0 personnel *(Not Working)*
- o   *11/17/2024: (No Report)*
- o   11/18/2024: 3 personnel (1 Day, 1 Night, 1 Offsite) *(Not Working/Standby)*
- o   11/19/2024: 3 personnel (1 Day, 1 Night, 1 Offsite) *(Not Working/Standby)*
- o   11/20/2024: 3 personnel (2 Day, 1 Offsite) *(Not Working/Standby)*
- o   11/21/2024: 0 personnel *(Not Working)*
- o   11/22/2024: 16 personnel (13 Day, 2 Night, 1 Offsite)
- o   11/23/2024: 14 personnel (13 Day, 1 Night)
- o   11/24/2024: 7 personnel (7 Day)

## Quantities and Architectural Dimensions

A review of the executive summaries reveals a complete absence of dimensions or precise material quantities regarding the architectural finishes removed.   While the summaries frequently note the actions taken (e.g., *"Crews began the removal of the wet ceiling tiles,"* *"Carpet removal was completed,"* or *"Floor adhesive removal is underway"*), at no point do these reports quantify the work.  There are no measurements of:

- o   The square footage of carpet removed
- o   The dimensions or square footage of floor adhesive ground down
- o   The number or total square footage of ceiling tiles or insulation removed
- o   The dimensions of drywall or wall paneling affected

StopLoss's logs included moisture maps (see **Figure 4** on the following page) which indicated areas being worked on, but for all interior mitigation and demolition, the reports contain zero dimensional data.



**Figure 4: Moisture Map – typical (StopLoss, 11/13/2024)**

While the daily logs do not explicitly calculate the total square footage of carpet they tore out, the subsequent building repair estimates outline the measurements of the carpet that reportedly requires replacement:

- Engle Martin calculates **5,403.67 SF** of "Glue down carpet - heavy traffic" requiring replacement in the Main Dining areas.

- Frontline calculates **7563.10 SF** replacement needs for "Glue down carpet - heavy traffic" across all areas, including the "Formal Room" which was documented by Engle Martin to have pre-existing damages unrelated to the pipe leak.

The red box on StopLoss's moisture map in **Figure 4** above (added by DFCG) outlines the areas in which StopLoss's mitigation efforts in removing flooring were documented.  This coincides with the approximate area estimated by Engle Martin for flooring replacement.

**DFCG's Commentary:** An evaluation of the mitigation efforts performed by StopLoss reveals that the scope, duration, and associated costs of their operations are grossly disproportionate to the actual water damages sustained from the localized plumbing leak.

StopLoss's mitigation invoices, totaling $654,335.60, represent a severe deviation from standard industry practices, especially when compared to the audited mitigation costs of $470,036.52 (and, as discussed below, it is DFCG's opinion that the actual, warranted cost of mitigation is significantly less than even the $470,036.52 allowed by Specialty).

Evaluating this claim from a cost-estimating and construction management perspective highlights several critical failures in the justification of these charges.

<u>Unjustified Complexities:</u> StopLoss introduced unnecessary complexities into the project, such as elaborate containment strategies, phased demolition, and extensive night-shift operations. While performing mitigation at night can theoretically allow a business to remain operational, deploying massive night crews for nearly a month to perform a standard tear-out which encompassed approximately 5,400 SF of flooring, is highly inefficient and costly.

<u>Excessive Manpower and Worker Productivity:</u> The StopLoss operation spanned a 27-day period, during which they deployed an entirely unreasonable number of personnel for the physical scope of the loss.  Generating a mitigation footprint that requires upwards of 20 to 25 workers per shift over multiple weeks is at a minimum an inefficient allocation of resources that serves to inflate man-hours rather than efficiently stabilize the property.

This gross overstaffing is magnified when analyzing standard worker productivity metrics. Industry-standard Xactimate line items provide clear baseline yields for these specific demolition activities:

- **Carpet Removal (WTRFCCGD[2]):** Tearing out and bagging wet, non-salvageable glue-down carpet yields an expected worker productivity of **57.68 SF per man-hour.**
- **Floor Prep/Scraping (FCCFP+[3]):** Scraping the flooring/glue residue to prep the concrete floor yields an expected worker productivity of **112.92 SF per man-hour.**

When applying these standard productivity rates to the 5,403 SF of glue-down carpet that required replacement, the expected labor is mathematically straightforward:

- **Tear-out:** 5,403 sq ft / 57.68 sq ft per hour = approximately **94 man-hours.**
- **Scraping/Prep:** 5,403 sq ft / 112.92 sq ft per hour = approximately **48 man-hours.**

Standard industry metrics dictate that the entire flooring removal and floor preparation phase should have taken approximately **142 total man-hours** for a total combined efficiency of **38.05 SF per man-hour.**

In stark contrast, a review of the StopLoss timesheets within the mitigation audit details that the contractor billed for 2,146.25 regular man-hours and 708.75 overtime man-hours, for **a total of 2,855 man-hours** across the operation.

---

[2] *Xactimate, Price List Item "WTRFCCGD", accessed March 2026*

[3] *Xactimate, Price List Item "FCCFP+", accessed March 2026*

Even if we assume only half of the billed man-hours were dedicated exclusively to the 5,403 SF of flooring tear-out, StopLoss's overstaffing achieved an actual worker productivity rate of approximately **3.78 SF per man-hour**, or **90.1% less efficient** than the industry standard worker productivity metrics would indicate.

It is understood that working in a water-damaged restoration environment with active containment can introduce inefficiencies that lower standard productivity rates.  However, even allowing for significantly decreased productivity due to a restoration environment, nighttime phasing, and other unknown site issues, a yield of only 10% of the expected productivity rate is entirely unjustifiable.

<u>Failure to Document and Lack of Access</u>: The StopLoss daily executive summaries fail to document any specific square footages, dimensions, or precise material quantities for the architectural finishes removed.  Compounding this lack of documentation is the fact that these extensive, undocumented tear-outs were performed while simultaneously denying the insurance carrier's representatives access to the site.  Completing a total demolition and mitigation protocol while actively preventing an independent inspection severely prejudices the carrier's ability to verify the true extent of the moisture distress and determine if the 27-day operation was actually warranted.

<u>Reasonableness:</u> By any standard metric of construction management or cost estimating, a reasonable and prudent owner of a restaurant would not independently elect to go through this highly disruptive, month-long process to rack up a $650,000 mitigation bill for a localized leak that caused less than $45,000 in repairable, non-structural damages.  The methodology employed here points to a strategy of maximizing billable hours and equipment charges rather than performing a targeted, necessary mitigation of the loss.

## StopLoss Mitigation Invoice/Audit by Specialty Audit Services

DFCG reviewed the StopLoss mitigation invoices and audit of the mitigation services performed by Specialty Audit Services (Specialty).   The mitigation audit of the StopLoss invoice resulted in a reduction of the total claim from the original billed amount of $654,335.60 to an amount of $470,036.52, creating a total variance (reduction) of $184,299.08.

Below is a detailed breakdown of the major changes by category, the auditor's specific rationale for the adjustments, and DFCG's commentary.

### Lodging and Per Diem (Variance: -$80,150.40)

- **The Change:** The auditor completely denied the $80,150.40 billed for travel, lodging, and per diem expenses.
- **Auditor's Rationale:** The auditor determined that these types of travel and living expenses are strictly "not warranted or necessary for this non CAT [catastrophe] loss".

Because this was a localized plumbing event and not a regional catastrophe, out-of-town deployment expenses were disallowed.

**DFCG Commentary:** DFCG concurs with Specialty's findings that lodging and per diems are not warranted for this project.  The property owner was not obliged to retain StopLoss for this mitigation effort as an abundance of local service providers are readily available.  A simple geographic search indicates there are at least 15 alternative water restoration and mitigation contractors currently located within approximately 5 miles of the subject property, completely negating any necessity to utilize an out-of-market vendor that incurs extensive travel and lodging expenses (see **Figure 5** below).



Figure 5: Local Water Mitigation Contractors (Google, March 2026)

## Equipment (Variance: -$71,593.00)
- **The Change:** Equipment charges were reduced from $167,406.00 to $95,813.00.
- **Auditor's Rationale:** Equipment billing was revised from daily rates to a weekly rate (calculated strictly as 5 days equating to one week).  Base rates were also reduced to align with current industry standards.
  - **Unwarranted Heavy/Admin Equipment:** The auditor explicitly excluded charges for a 10,000 lb Forklift, a Mobile Command Center, a Communications Package, and an Administrative Package, noting none of these were necessary or warranted for a non-CAT loss.

- o **Unjustified Billing Days:** All equipment charges for November 15, 16, and 17 were excluded because the contractor provided no equipment validation for those specific dates.
- o **Dehumidifier Usage**: Dehumidifiers were excluded for all days past November 14 because StopLoss failed to provide any further moisture readings to justify running the drying equipment beyond that date.

**DFCG Commentary:** In standard construction and mitigation practices, equipment retained on-site for extended durations should transition to weekly or monthly billing tiers to prevent severe rate gouging.  The contractor's attempt to bill prolonged daily rates for a month-long project contradicts standard estimating practices and artificially inflates the claim.

The deployment of heavy machinery for a localized interior plumbing leak is highly irregular and entirely unjustifiable.  These items are typically reserved for large-scale catastrophe (CAT) responses or massive commercial structural failures.

The logs explicitly state that crews were off and no operations were performed on November 15 and 16, and the documentation for November 17 is entirely absent from the record.  Billing for idle equipment on non-working, unverified days without supporting documentation is an improper billing practice.

The auditor's exclusion of dehumidifier charges post-November 14 is in line with industry standards protocols such as the IICRC S500, which require that the deployment of drying equipment be actively monitored and supported by daily, documented moisture readings of the affected materials.  Failing to provide moisture readings after November 14 means the contractor has no empirical data to prove the structure was still wet, rendering any continued billing for dehumidification operations unsubstantiated.

## Labor (Variance: -$25,309.39)
- **The Change:** Labor charges were reduced from $248,505.01 to $223,195.63.
- **Auditor's Rationale:**
  - o **Overtime Enforcement:** The auditor applied a strict rule that no overtime is allowed until 40 regular hours have been met by an individual worker, with the only exceptions being for weekends and holidays.
  - o **Excluded Roles**: The labor hours billed for a "photo documentation officer" were entirely removed.  The auditor noted that taking photographs is a standard part of the mitigation job.

**DFCG Commentary:** The auditor's adjustment to the overtime billing is justified and aligns with standard construction and mitigation billing practices.  The standard metric for time-and-materials or mitigation billing dictates that straight time applies to the first 40 hours.

The complete removal of the "photo documentation officer" is appropriate.  In the restoration and mitigation industry, taking progress and documentation photographs is a fundamental, expected duty of the on-site Restoration Supervisor, Foreman, or Project Manager.  Inventing a standalone, billable role exclusively for taking photographs is a blatant redundancy.

## Reimbursable Items (Variance: –$5,199.59)

- **The Change:** Reimbursable items (which cover supplies, dumpsters, security, industrial hygienists, and fuel) were reduced from $150,819.05 to $145,619.46.
- **Auditor's Rationale:**
  - **Personal Protective Equipment (PPE):** Charges for Level 1 PPE (hard hats, eye protection, hearing protection) were revised.  The auditor allowed only the maximum amount needed at the beginning of the week, noting that these items are reusable and should not be billed daily.
  - **Fuel Restrictions:** The auditor reviewed the fuel receipts and revised the allowance so that fuel costs were only approved for personnel who actually billed labor pertaining to this specific job site.

**DFCG Commentary:** The adjustment to Level 1 PPE is standard and entirely appropriate.  Items such as hard hats, safety glasses, and reusable ear protection are durable safety gear assigned to workers, not daily disposable consumables (unlike Tyvek suits, respirator cartridges, or nitrile gloves).

Attempting to bill for brand new hard hats and safety glasses for the same workers every single day of a 27-day project is an example of invoice padding.  The revisions on fuel costs are also appropriate as fuel expenses for contractor personnel who did not actually bill labor or physically work on this project are travel expenses unrelated to this specific insurance claim.

## Small Tools Fee (Variance: –$2,046.70)

- **The Change:** The 3% small tools fee was reduced from $7,455.14 to $5,408.44.
- **Auditor's Rationale:** This percentage-based fee was removed from the labor totals of all Supervisors and Project Managers.  The auditor determined that personnel in these oversight and administrative roles did not require the small tools fee.

**DFCG Commentary:** The auditor's removal of the small tools fee from supervisory and administrative labor categories is correct and aligns with standard construction accounting practices.

Project Managers and Restoration Supervisors are on-site to provide oversight, not actively perform the physical tear-out.  Applying a blanket percentage-based tools surcharge to the highest-billing management tiers is an improper billing practice that artificially inflates the invoice.

## Summary of Mitigation Invoices/Audit

DFCG's review of the Mitigation Invoices and Mitigation Audit indicates general concurrence with the auditor's findings and reductions.  The audit correctly adheres to standard restoration industry practices which StopLoss failed to observe in their initial billing.

Specialty's removal of unwarranted out-of-town per diem, unauthorized overtime, and excessive heavy equipment charges represents a necessary correction to an improperly inflated invoice.

However, from a cost-estimating perspective, it is DFCG's opinion that the actual, warranted cost of mitigation is significantly less than even the $470,036.52 allowed by Specialty.  While the audit effectively addressed administrative billing errors and rate discrepancies, it still evaluates the claim based on an inherently unreasonable 27-day mitigation timeline.

Given the localized nature of the plumbing leak and the approximately 5,400 square feet of actual flooring affected, a reasonable and prudent response would require only a fraction of the deployed man-hours and equipment runtime.  Therefore, while Specialty's methodology in reviewing the submitted charges is sound, the baseline scope of work performed by StopLoss remains excessive, indicating that the true, justifiable value of the necessary mitigation falls well below the auditor's final adjusted figure.

# OBSERVATIONS CONCLUSIONS

## Exterior Observations

DFCG did not observe distress attributable to the plumbing leak to the exterior cladding of the subject structure.  Staining, discolorations, cracks, etc. observed to the stucco exterior cladding are the result of long-term deferred maintenance and exposure to the elements.   Peeling paint to the stucco at the base perimeter of the subject structure can be attributed to long-term deferred maintenance in conjunction with being in contact with the ground coverings allowing moisture to wick into the stucco delaminating the paint over time.

## Roof Deficiencies

The project documentation reviewed by DFCG provides evidence that the portions of the claimed moisture damages to the subject structure's ceilings and flooring predate the reported 10/28/2024 pipe leak.   The documentation, particularly the Stephens Engineering Report, explicitly links the moisture damage in the Main Dining area's ceilings and flooring to preexisting conditions and ongoing roof issues in the aftermath of Hurricane Beryl, establishing a clear timeline of damage that predates the pipe leak.

Stephen's inspection, conducted on 9/13/2024, documented persistent *"ponded water and stained roofing, with vegetation growth"*, indicating an ongoing historical drainage deficiency. Stephens noted *"separations…consistent with thermal movement and mechanical damage"*  but no storm-created openings in the roofing membrane.  See **Figure 6** below.



**Figure 6: Roof photos (Stephens, 09/13/2024)**

Based on a review of historical aerial photos, the modified bitumen portions of the roof were replaced or recovered sometime between October 2024 and December 2024 (see **Figures 7-8**). However, long-term moisture pooling on the modified bitumen roofing remains clear as noted in **Figure 9** on the following page.  This continued, chronic roof condition is a likely cause of the ongoing interior moisture distress observed on the interior architectural finishes, entirely independent of the localized plumbing failure.



**Figure 7: Roof overview (EagleView, 10/12/2024)**



**Figure 8: Roof overview (EagleView, 12/20/2024)**



**Figure 9: Roof overview (DFCG, 03/09/2026)**

## Preexisting Damages in Main Dining Area

Stephens documented evidence of active and historical water intrusion throughout the structure, well outside the kitchen area.  The report notes the presence of moisture-stained ceiling tiles and rusted T-Bar grid systems specifically in the *"main eating area."*

The rusting of the grid system is a critical indicator; it demonstrates that the moisture exposure was not a recent, one-time event, but rather a *"repeated and long-term exposure to moisture."* Furthermore, the report clearly documents "*moisture-stained carpet in the main eating area."* **(Figure 10).**



Figure 10: Ceiling/Carpet photos (Stephens, 09/13/2024)

These damages to the Main Dining room's ceiling and carpet were physically observed and officially documented in September 2024.  It is a chronological impossibility for them to have been caused by a pipe leak on 10/28/2024.

# SEGREGATION OF DAMAGES

Based on onsite observations, review of the provided documentation, analysis, and experience in investigating and estimating remedial repairs, DFCG has formed the following opinions on the extent of distress related to the 10/28/2024 plumbing event:

- **Attributable to the Plumbing Leak:**
    - The missing, distressed, or recently replaced ceiling tiles located specifically in the back-of-house kitchen and dishwashing areas are in the direct vicinity of the reported pipe rupture.  It is reasonable to attribute the damage in these specific locations to the plumbing leak.
    - The previously removed carpet in the Main Dining area falls within the acceptable scope and can be attributed to the water intrusion from the plumbing leak.

- **Unrelated to the Plumbing Leak:**
  - The remaining missing or distressed ceiling tiles throughout the rest of the building cannot be attributed to the plumbing leak, as they fall well outside the vicinity of the incident and would not have reasonably been affected by that localized water release.
  - The staining and discoloration observed on these remaining tiles are the direct result of alternative, documented causes.  These include the previously reported water intrusions from Hurricane Beryl, long-term deferred maintenance of the building envelope, environmental wear from typical commercial restaurant operations or other causes.
  - The remaining previously removed carpet throughout the rest of the building cannot be attributed to the plumbing leak, as they are outside the vicinity of the incident and would not have reasonably been affected by that localized water release.  Additionally, the flooring was previously documented as moisture-stained prior to the date of loss.

- **Attributable to Renovation Efforts**: The removal of drywall, wall paneling, and other architectural finishes outside the specific, localized area affected by the plumbing leak is clearly attributable to the insured's voluntary ongoing renovation and remodeling efforts.

# COST ESTIMATE BY DFCG

DFCG was authorized by the client to provide an independent opinion of construction costs (cost estimate) to repair water damages related to the broken ceiling pipe.  DFCG's cost estimate has been based on a professional estimating assessment of data provided, published construction cost references, and experience in estimating remedial repairs.  DFCG reserves the right to review, supplement, and amend these cost estimates if required.

## Estimating Methodology

<u>Scope of Repairs:</u> The scope of repairs within DFCG's cost estimate has been based on a review of provided documentation in conjunction with a professional estimating assessment of the data obtained during DFCG's on-site observations of general site conditions, inclusive of standard construction means and methods, and site-specific logistical requirements, where applicable.

<u>Quantity Takeoffs:</u> Quantity takeoffs were calculated based on on-site collected data and 3D camera scan.  Measurements used within DFCG's cost estimate are to be considered approximate.

**Material and Labor Costs:** DFCG utilized construction cost data and productivity rates from various industry sources in calculating the direct construction costs and indirect project costs in DFCG's cost estimate. DFCG's primary cost data reference used was Xactimate by Xactware Solutions, Inc. (Xactware). For the purposes of this report, DFCG used the published construction price list for the local zip code for the reported date of loss.

Xactimate[4] is the most frequently used source of construction cost data in the property restoration industry. Xactware researches and analyzes local labor wages, worker productivity, material costs, equipment rental costs, and other market conditions to provide cost information that is reflective of pricing recently submitted for actual work that has been completed within a specific geographic area. On average, Xactware acquires several million data points each month. This cost data is obtained using a combination of surveys, direct data feeds, and completed estimate transactions and bids provided by over 100,000 retail and wholesale material suppliers, equipment suppliers, general contractors, sub-contractors, and other specialty service providers. Updated pricing information is published in over 500 regionally-based construction cost databases for the United States and Canada on a monthly basis.

## OPINION OF PROBABLE CONSTRUCTION COSTS

Based on onsite observations, received information, research, analysis, and experience in estimating remedial repairs, DFCG's opinion of probable construction cost (cost estimate) to perform repairs related to the broken ceiling pipe at the property located at 12755 Southwest Freeway in Stafford, Texas is **$44,063.18 RCV and $35,006.70 ACV.**

DFCG's cost estimate is intended to include all labor, materials, equipment, fees, taxes, and other expenses required to perform the noted remedial repairs to the subject structure as previously detailed. DFCG has not included any adjustments to the cost estimate for deductibles, prior payments (if any), or other insurance policy requirements which may affect the amount of a net claim.

A line-item detail of DFCG's cost estimate has been included in the **Appendix** section of this Report.

---

[4] *Verisk Analytics, Inc., Xactware Solutions, Inc., "Pricing Methodology Summary", 2021.*

## QUALIFICATIONS & COMPENSATION

Copies of the curriculum vita and last four years of testifying cases for Timothy J. Lozos, CPE (Principal Consultant) have been included in the **Appendix** of this report.   Additionally, a copy of DFCG's current rate sheet has been included.

## LIMITATIONS

This document is a forensic work product provided solely in DFCG's capacity as a building consultant and represents the rendering of a professional consulting service, the essence of which is the provision of advice, judgment, opinion, and professional skill.

This document is not to be construed as a "real estate inspection" as defined or regulated under Texas law, including Chapter 1102 of the Texas Occupations Code or the rules of the Texas Real Estate Commission (TREC) nor does it constitute a real estate inspection or property inspection as defined by the laws, statutes, or ordinances of any other state or jurisdiction.  This document was not prepared for and shall not be used the purpose of a real estate transaction.

This document is not to be construed as providing professional engineering services, analysis, calculations, design, or opinions.  This document is not intended for regulatory approval, permitting, or construction.  Additional documents prepared by licensed design professionals may be required and are beyond the scope of this assignment.

The observations documented in this document are intended to be representative of the general architectural condition of the structures observed.  No attempt has been made to document the condition of each and every building element.  Observations were limited to conditions that were visible and reasonably accessible at the time of the site visit.  Concealed, latent, or intermittent conditions may exist that were not observed or identified.  Destructive testing was not performed by DFCG unless expressly stated otherwise.

Where opinions of probable construction costs (cost estimates), scopes of work, or other pricing or remedial concepts are provided, they are opinions based on information available at the time of preparation and are subject to change.  Actual costs and scope may vary due to unknown or concealed conditions, market conditions, availability and experience of qualified contractors, municipal or regulatory requirements, and contractor means and methods.  Unless otherwise noted, a contingency or allowance for these or other unknown factors have not been included

The opinions and conclusions expressed in this document are based on conditions observed and information available at the time of preparation.  In the event that additional information becomes available that could materially affect the conclusions reached herein, DFCG reserves the right to review and, if appropriate, revise some or all of the opinions presented in this document.

This document has been prepared for the exclusive use of the Client and its representatives for the specific purpose indicated within.  Any or all usage or reliance upon this document by parties other than the Client is expressly prohibited.



# APPENDIX I

# Photographs




1     1-Front Elelvation        Date Taken: 3/9/2026

General overview of front entrance


![Stucco overview of subject property]

2        2-Stucco overview                Date Taken: 3/9/2026

General condition of stucco at subject property




3        3-Right elevation (Southwest)        Date Taken: 3/9/2026

Staining and discoloration to stucco




4     4-Right elevation (southwest)     Date Taken: 3/9/2026

Approximate 3' horizontal crack with FRP paneling. Peeling paint to stucco at base permitter




5     5-Left elevation (northeast)     Date Taken: 3/9/2026

Cracked glazing panels



**DeFacto Consulting Group, Inc.**

84  NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net



| 6 | 6-Construction debris | Date Taken: 3/9/2026 |

Located on property




7      7-Construction debris         Date Taken: 3/9/2026

Located on property




8        8-Roof general overview              Date Taken: 3/9/2026

Concrete roofing tiles, modified bitumen, single-ply membrane




9          9-Modified bitumen                    Date Taken: 3/9/2026

General overview of the modified bitumen and roof appurtenances over the primary roof





10      10-Concrete roofing tiles          Date Taken: 3/9/2026

General overview of concrete roofing tiles



**DeFacto Consulting Group, Inc.**

84  NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net



11      11-Single-ply membrane          Date Taken: 3/9/2026

General overview of the singe-ply membrane in the back southwest corner




12  12-Single-ply membrane    Date Taken: 3/9/2026

General overview of the single-ply membrane over RTU




13        13-Dining area
         General state of dining area




14      14-Exposed steel framing



15      15-Saw cuts

Saw cuts beginning at northeast exterior wall


16       16-Saw cuts

Saw cuts continue into kitchen hallway





17      17-Saw cut

Additional saw cut in the northeast section of the main cooking area




18      18-Back of house
        General condition





19      19-Back of house
        Tile generally in place



20      20-Back of house

drywall and wall paneling generally still in place




21      21-Back of house

Ceiling tiles still generally in place but stained


22      22-Cooking equipment

Disconnected




23      23-Cooking equipment

Disconnected and randomly placed cooking equipment


![Construction site with piles of earth adjacent to interior saw cuts]

24        24-Construction debris

Piles of earth adjacent to interior saw cuts


![Construction debris and materials photograph]

25      25-Construction debris and
        meterials
        Construction debris, materials, and tools strewn throughout the interior



# APPENDIX II

# Matterport Link

https://my.matterport.com/show/?m=zpciCxXUg8X



# APPENDIX III

# Cost Estimate



## DeFacto Consulting Group, Inc.

84 NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net

|  | |
|---|---|
| Insured: | Fortune Property Managment, LLC |
| Property: | 12755 Southwest Freeway |
| | Stafford, TX 77477 |

**Claim Number:** KY24K3100086     **Policy Number:** FSF17727527     **Type of Loss:** Water Damage

| | | | |
|---|---|---|---|
| Date of Loss: | 10/28/2024 12:00 AM | Date Received: | |
| Date Inspected: | | Date Entered: | 3/19/2026 2:40 PM |

|  | |
|---|---|
| Price List: | TXHO8X_OCT24 |
| | Restoration/Service/Remodel |
| Estimate: | 1262-FORTUNE |

This cost estimate has been prepared in accordance with generally accepted professional estimating practices. A reasonable standard of effort has been exercised to verify the inclusion of all known items as provided in the related project documents and to price all items utilizing appropriate quotations, published reference data, or authorized proprietary sources, as tempered by experience and professional judgment.

This document is the rendering of a professional service, the essence of which is the provision of advice, judgment, opinion, or professional skill. In the event that additional information becomes available that could affect the conclusions reached in this cost estimate, this office reserves the right to review, and, if required, change some or all of the opinions presented herein.

This report has been prepared for exclusive use of the client and its representatives. No unauthorized re-use or reproduction of this report, in part or whole, shall be permitted without prior written consent.


**1262-FORTUNE**

### General Conditions

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 1. Haul debris - per pickup truck load - including dump fees | 1.00 EA | 179.29 | 17.75 | 35.86 | 232.90 | (0.00) | 232.90 |
| **Totals: General Conditions** | | | **17.75** | **35.86** | **232.90** | **0.00** | **232.90** |

### Main Level

**Main Dining**        **Height: 10'**



| | |
|---|---|
| 2718.98 SF Walls | 5641.46 SF Ceiling |
| 8360.44 SF Walls & Ceiling | 5641.46 SF Floor |
| 626.83 SY Flooring | 249.62 LF Floor Perimeter |
| 316.45 LF Ceil. Perimeter | |

| Missing Wall | 24' 10 5/8" X 10' | Opens into EVENT_ROOM |
|---|---|---|
| Missing Wall - Goes to Floor | 20' 8" X 6' 8" | Opens into ENTRANCE |
| Missing Wall - Goes to Floor | 10' 5" X 6' 8" | Opens into OFFSET_AREA |
| Missing Wall - Goes to Floor | 21' 2" X 6' 8" | Opens into MURAL |
| Missing Wall - Goes to Floor | 14' 7" X 6' 8" | Opens into MURAL |
| Missing Wall | 16' 6" X 10' | Opens into MAIN_KITCHEN |
| Missing Wall | 12' 3" X 10' | Opens into BAR |
| Missing Wall | 24' 11 7/8" X 10' | Opens into BAR |
| Missing Wall | 7' 1 1/8" X 10' | Opens into RESTROOM_HAL |
| Missing Wall | 42' 1" X 10' | Opens into EAST_DINING_ |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 2. Content Manipulation charge - per hour | 40.00 HR | 48.77 | 193.13 | 390.16 | 2,534.09 | (527.94) | 2,006.15 |
| 3. Glue down carpet - heavy traffic | 5,403.67 SF | 5.05 | 2,701.56 | 5,457.70 | 35,447.79 | (7,384.95) | 28,062.84 |
| 4. Stain & finish baseboard - oversized | 474.33 LF | 2.14 | 100.49 | 203.02 | 1,318.58 | (274.71) | 1,043.87 |
| 5. Final cleaning - construction - Commercial | 5,403.67 SF | 0.26 | 139.09 | 281.00 | 1,825.04 | (380.22) | 1,444.82 |
| **Totals: Main Dining** | | | **3,134.27** | **6,331.88** | **41,125.50** | **8,567.82** | **32,557.68** |





| Kitchen/DW station | | | | | | Height: 10' |
|---|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| 559.41 | SF Walls | 282.14 | SF Ceiling |
| 841.55 | SF Walls & Ceiling | 282.14 | SF Floor |
| 31.35 | SY Flooring | 55.94 | LF Floor Perimeter |
| 55.94 | LF Ceil. Perimeter | | |

**Missing Wall**      **13' 3 5/16'' X 10'**      **Opens into FOOD_PREP**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 6. R&R Batt insulation - 10" - R30 - unfaced batt | 282.14 SF | 2.26 | 63.12 | 127.52 | 828.28 | (135.91) | 692.37 |
| 7. R&R Suspended ceiling system - Standard grade - 2' x 4' | 282.14 SF | 4.86 | 135.76 | 274.24 | 1,781.20 | (332.90) | 1,448.30 |
| 8. Final cleaning - construction - Commercial | 282.14 SF | 0.26 | 7.26 | 14.68 | 95.30 | (19.85) | 75.45 |
| **Totals: Kitchen/DW station** | | | **206.14** | **416.44** | **2,704.78** | **488.66** | **2,216.12** |
| **Total: Main Level** | | | **3,340.41** | **6,748.32** | **43,830.28** | **9,056.48** | **34,773.80** |
| **Line Item Totals: 1262-FORTUNE** | | | **3,358.16** | **6,784.18** | **44,063.18** | **9,056.48** | **35,006.70** |

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 19,272.32 | SF Walls | 14,130.21 | SF Ceiling | 33,402.53 | SF Walls and Ceiling |
| 14,130.21 | SF Floor | 1,570.02 | SY Flooring | 1,691.75 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 1,947.09 | LF Ceil. Perimeter |
| | | | | | |
| 14,130.21 | Floor Area | 14,541.09 | Total Area | 19,565.39 | Interior Wall Area |
| 6,175.05 | Exterior Wall Area | 521.33 | Exterior Perimeter of Walls | | |
| | | | | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |



**DeFacto Consulting Group, Inc.**

84 NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net

### Summary for Building

| | |
|---|---:|
| Line Item Total | 33,920.84 |
| Overhead | 3,392.09 |
| Profit | 3,392.09 |
| Comm. Rpr/Remdl Tax | 3,358.16 |
| **Replacement Cost Value** | **$44,063.18** |
| Less Depreciation | (9,056.48) |
| **Actual Cash Value** | **$35,006.70** |
| **Net Claim** | **$35,006.70** |
| Total Recoverable Depreciation | 9,056.48 |
| **Net Claim if Depreciation is Recovered** | **$44,063.18** |



**DeFacto Consulting Group, Inc.**

84  NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net

## Recap of Taxes, Overhead and Profit

|  | Overhead (10%) | Profit (10%) | Comm. Rpr/Remdl Tax (8.25%) | Manuf. Home Tax (5%) |
|---|---|---|---|---|
| **Line Items** | 3,392.09 | 3,392.09 | 3,358.16 | 0.00 |
| **Total** | **3,392.09** | **3,392.09** | **3,358.16** | **0.00** |



**DeFacto Consulting Group, Inc.**

84 NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net

## Recap by Room

**Estimate: 1262-FORTUNE**

| | | |
|---|---|---|
| **General Conditions** | **179.29** | **0.53%** |
| | | |
| **Area: Main Level** | | |
| **Main Dining** | **31,659.35** | **93.33%** |
| **Kitchen/DW station** | **2,082.20** | **6.14%** |
| **Area Subtotal: Main Level** | **33,741.55** | **99.47%** |
| **Subtotal of Areas** | **33,920.84** | **100.00%** |
| **Total** | **33,920.84** | **100.00%** |



**DeFacto Consulting Group, Inc.**

84 NE Loop 410, Suite 219
San Antonio, TX 78216
800-674-DFCG
info@dfcg.net

### Recap by Category with Depreciation

| O&P Items | RCV | Deprec. | ACV |
|---|---:|---:|---:|
| ACOUSTICAL TREATMENTS | 1,230.13 | 307.53 | 922.60 |
| CLEANING | 1,478.31 | 369.58 | 1,108.73 |
| CONTENT MANIPULATION | 1,950.80 | 487.70 | 1,463.10 |
| GENERAL DEMOLITION | 455.79 | | 455.79 |
| FLOOR COVERING - CARPET | 27,288.53 | 6,822.13 | 20,466.40 |
| INSULATION | 502.21 | 125.55 | 376.66 |
| PAINTING | 1,015.07 | 253.77 | 761.30 |
| O&P Items Subtotal | 33,920.84 | 8,366.26 | 25,554.58 |
| Overhead | 3,392.09 | | 3,392.09 |
| Profit | 3,392.09 | | 3,392.09 |
| Comm. Rpr/Remdl Tax | 3,358.16 | 690.22 | 2,667.94 |
| **Total** | **44,063.18** | **9,056.48** | **35,006.70** |



East Dining Area

Walk in Freezer 2

Trash Hallway

Back Room 2

Back Room 3

Storage 1

Back Room 1

Storage Hallway

Electrical Room

Office

Food Prep

Walk in Freezer 1

Main Kitchen

Womans Restroom

Mens Restroom

Locker Room

Kitchen/DW station

Wash Room

Employee Restroom

Restroom Hallway

Employee Shower

Bar

Main Dining

Mural

Offset Area

Entrance

Waiting Room

Event Room



# APPENDIX   IV

# CV & Rate Sheet





**Timothy J. Lozos, CPE** brings almost 30 years of construction estimating and cost consulting experience to DFCG. His experience includes construction cost estimating, property condition assessments, roofing/building envelope evaluations, and cost analysis of several thousand structures in both restoration and new construction environments. Mr. Lozos has extensive experience in estimating single family and commercial ground-up projects, as well as providing expert witness evaluations of property damages and construction defects for litigation and insurance purposes.

### Expertise

Construction cost estimating and cost analysis. Independent appraiser and appraisal umpire in hundreds of insurance appraisals with multi-million dollar disputed amounts. Roofing and building envelope investigation. Estimation of remedial repair costs for residential, multi-family, commercial, or industrial structures that have sustained damage from perils such as accidents, collapses, construction defects, expansive soils, explosions, fires, flood, hail, hurricanes, lightning, mold, plumbing leaks, tornadoes, vandalism, vehicular impacts, veneer/cladding failures, water intrusion, windstorms, and wood rot.

Calculation of lost profits (construction). Evaluation of direct/indirect costs, estimating methodology, scope of work, quantity take-offs, and unit costs. Projected cost escalations and contingencies. Contractor bid solicitation, qualification, due diligence, and standard of care. Replacement cost and depreciation evaluation. Xactimate® software estimating. Single-family residential construction estimating. Construction of modular buildings and manufactured housing.

Mr. Lozos' litigation support experience includes deposition, trial, arbitration, and mediation.

**DeFacto Consulting Group, Inc.**

**Dallas/Fort Worth**
**Houston**

☎ 800·674·DFCG ⊕ www.dfcg.net
210 N. Ector Drive, #310 Euless, TX 76039

**San Antonio**
**Oklahoma City**

## Select Consulting Cases

- Expert witness for hurricane-related flooding damages to over 12,000 homes and businesses upstream of two federally designed and built west Houston reservoir dams.

- Expert witness for flooding damages occurring during two separate tropical storm events involving hundreds of private residences along a state-designed and constructed interstate highway in several Southeast Texas counties.

- Appraisal and risk analysis of claimed hail distress to over 500 buildings on 110 separate campuses of a major metro independent school district in South Texas.

- Causation investigation following the high-profile collapse of an indoor practice facility for a National Football League team.

- Appraisal and cost review of a claimed hurricane distress to a multi-campus private college involving over 100 separate structures in the Florida panhandle.

- Appraisal of claimed hurricane distress to a 120-unit condominium structure on the Texas Gulf Coast.

- Cost estimation and analysis of repair costs for a high-profile construction defect case involving a North Texas high school football stadium.

- Expert witness and appraisal analysis of a litigated hurricane appraisal award between a Texas Gulf Coast municipality and the State-run windstorm insurer.

- Cost estimation and analysis of cost-to-date expenses following an accidental explosion which destroyed a specialized blast-resistant structure and surrounding structures at a high-energy materials manufacturing facility of a national defense contractor in Arkansas.

- Estimation of remedial repair costs due to multiple construction defects and analysis of cost-to-date expenditures in a five subdivision, 243-unit public housing program in a major metro South Texas city.

- Cost estimation and allocation of hurricane-related damages, subsequent mold, asbestos and lead abatement, and other damages involving 30 separate facilities across nine campuses of a Louisiana public school district.

- Onsite investigation and cost proposal analysis of a disputed multi-million dollar hail damage claim consisting of 28 commercial and industrial properties.

- Cost analysis of a multi-million dollar stucco cladding repair budget for a 33-unit apartment complex construction defect claim.

## Certifications/Licensure*

- ASPE Certified Professional Estimator (CPE) - DST 1.4 General
- Appraisal Umpire Roster Member - Texas Department of Insurance
- HAAG Certified Roof Inspector - Commercial & Residential
- IICRC Certified Water Damage Restoration Technician (WRT)
- Registered Appraiser - Louisiana Department of Insurance
- Licensed Independent Adjuster (former) – Multiple states
- WIND Certified Appraiser and Umpire
- Xactimate® Level 3 Certification

*Certifications/Licenses listed may be currently in renewal. No offer of services is made in states where not authorized or registered.*

## Professional Memberships

- American Society of Professional Estimators (ASPE)
- American Society for Testing and Materials (ASTM)
- Association for the Advancement of Cost Engineering (AACE)
- International Institute of Building Enclosure Consultants (IIBEC)
- Institute of Inspection Cleaning and Restoration Certification (IICRC)
- National Roofing Contractors Association (NRCA)
- Property & Liability Resource Bureau (PLRB)
- The Claims and Litigation Management Alliance (CLM)
- Windstorm Insurance Network (WIND)

## Seminars/Professional Lectures

Mr. Lozos is an experienced speaker and educator having lectured on topics such as: *"Debunking Expert Witnesses", "Unit Costs – The Building Blocks of Estimating", "Cost Estimating and Bid Analysis", "The Basics of Insurance Appraisal", "Perils and Pitfalls of Insurance Appraisal", "Hail Distress Investigations"* and *"Xactimate for Attorneys"* at numerous industry conferences and educational seminars.

## Publications

- *"Guidelines to Assess Hail Damage to Shingle Roofs"*, American Society of Civil Engineers (ASCE) 6th Forensics Conference: Proceedings of the Sixth Congress on Forensic Engineering, San Francisco, CA, October 31 - November 3, 2012, with B. East, S. Verhulst, M. DeLeon, and D. Ahuja.

- *"How to Estimate the Cost of Selective Demolition and Replacement of Single-Coat Stucco Cladding in Multi-Family Housing"*, Technical Paper (peer-reviewed, unpublished), American Society of Professional Estimators, June 2010.



# Timothy J. Lozos, CPE - Expert Witness Appearances
## (Trial, Deposition, and Arbitration)

**Cause No. 2009-27673**
Hobbs Bonded Fibers, Inc. vs. Bailey Insurance & Risk Management, Inc.
74th Judicial District Court, McLennan County, Texas

**Cause No. 2009-65685**
MRCO, Inc. and Commercial Roof Consultants & Claims Management, LLC. vs.
Hardam S. Azad, individually and d/b/a 5 Million Square Feet Companies, et al.
80th Judicial District Court, Harris County, Texas

*In Arbitration*
Main Street Village Homeowners Association, Inc. vs. Pulte Homes of Texas, LP
Dallas County, Texas

**Cause No. 2011-25601**
Satterfield & Pontikes Construction, Inc. vs. ARC Abatement, Inc.
157th Judicial District Court, Harris County, Texas

**Cause No. 12CV0053**
City of League City, Texas vs. Texas Windstorm Insurance Association
10th Judicial District Court, Galveston County, Texas

**Cause No. 10CV0990-A**
Lindstrom Cleaning and Construction, Inc. vs. Betzler Investments, LLC vs. Access Electric, Inc.
122nd Judicial District Court, Galveston County, Texas

**Cause No. DC-13-04108**
FortyOne11 Homeowners Assoc., Inc. vs. CityView Turtle Creek 95, et al.
62th Judicial District Court, Dallas County, Texas

**Cause No. DC-13-04118**
FortyOne40 Newton Owners Assoc., Inc. vs. CityView Turtle Creek 95, et al.
62th Judicial District Court, Dallas County, Texas

**Cause No. 2012-DCL-01561**
Emery Green, et al. vs. South Padre Island Development, LLC, et al.
138th Judicial District Court, Cameron County, Texas

**DeFacto Consulting Group, Inc.**

**Dallas/Fort Worth**
**Houston**

☎ 800·674·DFCG   ⊕ www.dfcg.net
210 N. Ector Drive, #310 Euless, TX 76039

**San Antonio**
**Oklahoma City**

# Timothy J. Lozos, CPE - Expert Witness Appearances
## (continued)

**Cause No. 2013-507250**
VT Augustan Apartments, LTD. vs. Cam Fannin Insurance Agency, Inc.
237th Judicial District Court, Lubbock County, Texas

**Cause No. 2010-5153**
Civic Center Site Development, LLC, et al. vs. Boyer, Inc., et al.
Orleans Civil District Court, Orleans Parish, Louisiana

**Cause No. 13CV30267**
Jack in the Box Eastern Division vs. Westec Construction Management Company, et al.
17th Judicial District Court, Broomfield County, Colorado

**Cause No. DC-13-12763-J**
TJ Trading Company, Inc. vs. Office Communications Systems, Inc. dba Toshiba
Business Solutions, et al.
191st Judicial District Court, Dallas County, Texas

*In Arbitration*
District A Townhome Association vs. Centex Homes d/b/a CityHomes, Centex Real Estate
Corporation
Dallas County, Texas

**Cause No. DC-14-06962**
M&R Home Restorations, LLC vs. Jodie and Matthew Simons
116th Judicial District Court, Dallas County, Texas

*In Arbitration*
Pulte Homes of Texas, LP vs. Nortex, et al.
Dallas County, Texas

**Cause 1:17-cv-09001-CFL**
In Re Upstream Addicks and Barker (Texas) Flood Control Reservoirs
United States Court of Federal Claims

**AAA Case No. 01-22-0003-4982**
Rajesh Rana and Chhaya Rana vs. Hayes Signature Homes, LLC
Dallas County, Texas

# Timothy J. Lozos, CPE - Expert Witness Appearances
## (continued)

**Cause No. C-3353-20-I**
S&B Infrastructure, LTD., vs. Agua Special Utility District
398th Judicial District, Hidalgo County, Texas

**AAA Case No. 01-21-0017-5487**
Mustang Park Townhomes vs. CB Jeni Homes DFW, LLC, Quality Construction, et al.
Dallas County, Texas

**Cause No. 22-CV-0440**
Trenton and Emily Keeble vs. Handy/South Holdings, LLC d/b/a South Custom Concepts
212th Judicial District, Galveston County, Texas

**Cause No. 2022L001494**
Commonwealth Edison Company vs. Onni Contracting, Inc.
Circuit Court of Cook County, Illinois

**Cause No. 23-06-07882**
Wave 1488, LLC, et al vs. Boatman Construction, LLC, et al.
284th Judicial District, Montgomery County, Texas

**AAA Case No. 01-24-0003-4332**
Michael Boyd and Kellyn Dukes vs. Cityside Homes, LLC
Harris County, Texas

**AAA Case No. 01-23-0005-2809**
Andrew White and Madison White vs. SWH Construction, LLC, et al.
Dallas County, Texas

**Cause No. 342-350628-24**
Deermont II LLC vs. Jack in the Box Eastern Division, LP
342nd Judicial District, Tarrant County, Texas



# DFCG 2026 Service Rates & Terms

## Hourly Rates

President/Principal Consultant..........................................$350/hr.
VP/Director/Technical Specialist....................................$315/hr.
Consulting Estimator/Senior Project Estimator.................$295/hr.
Project Estimator.........................................................$275/hr.
Senior Associate Estimator............................................$265/hr.
Associate Estimator......................................................$245/hr.
Associate Technician....................................................$195/hr.
Administrative.............................................................$ 95/hr.
Expert Witness............................................................$500/hr.

## Other Rates

Expenses....................................................................Cost + 20%
Lodging/Mileage.....................................................Published GSA Rates
Drone/3D Scan/Infrared Equipment Rental.................$250/day (ea.)
*(equipment only; operator billed hourly)*

## General Terms and Conditions

Professional services are provided by DFCG to the Client on a time, expenses and retainage basis using hourly professional time and other rates according to this schedule. Flat fee rates may be available for certain projects. A retainer may be required prior to services being performed. When required, a retainer is not the total fee for the assigned project but is a non-refundable minimum fee for the assigned project. A retainer will be required for all Expert Witness appearances.

Professional/Associate time includes, but is not limited to, all preparation, travel, investigation, estimating, report composition, etc. Expenses include, but are not limited to, travel costs, printing, copying, mailing, media storage and transfer, laboratory services, materials testing, etc. Expert Witness time includes, but is not limited to, all preparation, document review, travel, and testimony. Expert Witness time for trial, deposition, arbitration, or mediation appearances will be billed in four (4) hour increments.

Rates and terms are subject to revision at the beginning of each calendar year. Payment is due upon receipt.

**DEFACTO CONSULTING GROUP, INC.**

**DALLAS/FORT WORTH**
**HOUSTON**

📱 800·674·DFCG   🌐 WWW.DFCG.NET
210 N. ECTOR DRIVE, #310 EULESS, TX 76039

**SAN ANTONIO**
**OKLAHOMA CITY**





*(This page intentionally left blank)*



DeFacto Consulting Group, Inc. is committed
to reducing our environmental footprint.

To support sustainability efforts, we encourage the use of this
document in its digital format whenever possible.



800-674-DFCG
www.DFCG.net